**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 9, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TIMOTHY REDMOND; NICK
WATSON; GEORGE MONFORT;
DANIEL LASSCHE; KRAIG
CANFIELD, and all others similarly
situated,

        Plaintiffs - Appellants,

    v.

SCOTT CROWTHER, as successor to
Alfred Bigelow in his official
capacity; ROBERT POWELL, in his
individual capacity; and JASON
NICHOLES, in his individual
capacity,

        Defendants - Appellees.

No. 16-4131

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2-13-CV-00393-DAK)**

---

Karra J. Porter (Kristen C. Kiburtz with her on the briefs), Christensen & Jensen,
P.C., Salt Lake City, Utah, for Appellants.

Joshua D. Davidson, Assistant Utah Solicitor General (Sean D. Reyes, Utah
Attorney General, with him on the brief), Office of the Utah Attorney General,
Salt Lake City, Utah, for Appellees.

---

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **LUCERO**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

———————————

This appeal arises from prison officials' attempt to gain control over an agitated prisoner who refused to obey their orders, locked himself in the prison's outdoor recreation yard, and threatened prison officials. To subdue the prisoner, prison officials decided to drop CS gas, a commonly used tear gas, into the recreation yard.

The plan went awry. The recreation yard contained a prison ventilation system intake vent, which draws air in from the recreation yard and circulates it inside the prison. So when prison officials deployed the gas, the intake vent drew the gas in and filtered it into the prison. Numerous prisoners in their cells were exposed to the gas, which caused a burning sensation in their eyes, ears, and noses, and made it difficult for them to breathe. Prison officials evacuated the prisoners housed in two sections of the prison after they secured the prisoner in the recreation yard. The officials did not, however, evacuate the prisoners in two other sections.

On behalf of a class of about one-hundred prisoners, Timothy Redmond sued three of the prison officials for constitutional violations under 42 U.S.C. § 1983, claiming the officials violated the Eighth Amendment and Utah's Constitution by exposing the prisoners to gas, and then failing to provide adequate medical care.

The district court granted the defendants' summary judgment motion. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM. The prison officials' conduct, at most, only accidently exposed the prisoners to CS gas, and qualified immunity shields government officials from liability for mistakes like this one. And the rest of Redmond's claims fail, too, either because Redmond forfeited them, failed to prove a constitutional violation occurred, or did not cite case law that clearly established the alleged rights. Finally, violating the Utah Constitution requires more-than-negligent conduct, and the prison officials' conduct was textbook negligence.

## I. Background

Redmond and the entire plaintiff class[1] were incarcerated in the Olympus Wing of the Utah State Prison, an inpatient treatment facility that houses prisoners with physical and mental health conditions. It has five divided sections. Section D includes a recreation yard which is enclosed by four walls and open to the sky. On one of those walls is an intake vent to Olympus's HVAC unit. The vent takes in air from the recreation yard and circulates it into the cells in sections A, B, C, and D.

James Hill is a prisoner housed in Section D. On August 3, 2011, Hill violated prison rules. When an officer tried to discipline him, Hill walked away.

---

[1] For ease of reading, we use "Redmond" as short-hand for the entire plaintiff class.

The officer ordered Hill to return to his cell, but Hill refused. In response, prison officials ordered all prisoners to return to their cells and locked the doors.

But Hill did not return to his cell. He instead walked into Section D's recreation yard and closed the door behind him, which caused it to lock. Hill then took off his glasses and began sharpening them on the wall. He declared he would "stick or cut the first pig that came out there," paced aggressively, swung his arms in the air, swore, and spit at prison officials. App. at 283.

In response, Robert Powell, the lead officer on duty that day, called the special operations unit, which Jason Nicholes led. Nicholes and his team planned how to extract Hill. Nicholes considered various options such as using a shield wall, shooting Hill with a rubber bullet, or deploying pepper spray. In the end, however, Nicholes concluded that these paths presented additional risks to staff, so he decided to deploy CS gas.

But before doing so, Nicholes examined the recreation yard and looked for risks—he did not notice any, nor did he notice the HVAC vents. With his team in place, Nicholes instructed Hill to submit to a strip search and be handcuffed. He warned Hill that if he did not comply, force would be used. Hill nevertheless flipped off Nicholes and said "F*** you, fascist." App. at 288.

Nicholes then ordered his team to deploy the CS gas. The plan went smoothly except for a significant problem—the HVAC unit. Because the recreation yard contained the HVAC unit's intake vent, the vent drew the gas in

and pumped it inside the prison. The gas went into the cells in sections A, B, C, and D. It also went into administrative areas. The gas caused a burning sensation in prisoners' eyes, ears, and noses, and made it difficult for them to breathe.

It took about thirty minutes for Powell and other prison officials to evacuate the prisoners in Sections B and C. During the evacuation, Powell went into the recreation yard and confirmed that medical staff were offering assistance to prisoners. Yet when the evacuated prisoners were lined up in the recreation yard, Powell told them:

> if any of you sissies absolutely need medical treatment, that's fine, but if any of you are just going over there to whine and cry, something to that extent, or say, oh, my eyes hurt or something like that, I'm going to put you on lockdown or see about having you removed from this facility. I'm not going to have you wasting time with those complaints. If you're about to die, that's one thing.

App. at 1284. Two prisoners claim they would have sought medical treatment had Powell not made this statement.

Next, Powell entered sections A and D.[2] Powell thought the gas had dissipated in these sections and that the prisoners no longer complained about the gas. He thus decided to not evacuate Sections A and D at all. To air these sections out, Powell instead opened the ports of the cells' doors and placed an

---

[2] The prisoners housed in Sections A and D cannot mingle with other prisoners. They consequently could not be evacuated alongside the prisoners in Sections B and C.

industrial fan in the doorway. Medical staff also walked around Sections A and D to ask if prisoners needed medical care.

# II. Analysis

Redmond contends that Powell and Nicholes violated the Eighth Amendment by exposing the prisoners to CS gas and then failing to respond adequately to their resulting medical needs. He also claims Powell, Nicholes, and Crowther violated the Utah Constitution's unnecessary-rigor clause by exposing the prisoners to CS gas.

We first discuss our standard of review before turning to Redmond's claims under the Eighth Amendment and the Utah Constitution.

## A. *Standard of Review*

Ordinarily, we grant summary judgment only if no genuine issue as to any material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). But our "review of summary judgment orders in the qualified immunity context differs from that applicable to review of other summary judgment decisions." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.*

In determining whether the plaintiff meets this burden, we "ordinarily accept the plaintiff's version of the facts—that is, the 'facts alleged.'" *A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016) (quoting *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)). But "because at summary judgment we are beyond the pleading phase of the litigation, [the] plaintiff's version of the facts must find support in the record." *Id.* (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). Thus, if the non-moving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it," then we "should not adopt that version of the facts." *Thomson*, 584 F.3d at 1312.

To qualify as clearly established, a constitutional right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). A case clearly establishes a right "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as [the] plaintiff maintains." *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197-98 (10th Cir. 2010). And although there need not be a case precisely on point for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308. This high bar ensures qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.*

And it is a "longstanding principle that clearly established law should not be defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam). The "dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308. We therefore must determine whether a right is clearly established "in light of the specific context of the case, not as a broad general proposition." *Id.*; *see also White*, 137 S. Ct. at 552.

## B.      Eighth Amendment Claims

Redmond claims Powell and Nicholes violated the Eighth Amendment by (1) exposing plaintiffs to CS gas; (2) discouraging plaintiffs from seeking medical attention and not permitting them all to leave their cells or to shower; (3) verbally abusing and intimidating plaintiffs; and (4) failing to train prison staff regarding the use of CS gas.

We examine each claim in turn, and find none persuasive.

### 1.      Exposure to Gas

Redmond contends Powell and Nicholes violated the Eighth Amendment by exposing prisoners to CS gas. To begin with, the parties dispute whether we should analyze this claim under the conditions-of-confinement framework or the excessive-force framework. Redmond argues that when "assessing the claims of innocent bystanders who are not the intended target of force and whose exposure

to force does not further the purpose of maintaining and restoring discipline," the conditions-of-confinement framework applies. Aplt. Br. at 40. We disagree.

The Supreme Court made clear in *Whitley v. Albers* that when prison officials employ force "to resolve a disturbance . . . that indisputably poses significant risks to the safety of inmates and prison staff," we must analyze that use of force under the excessive-force rubric. 475 U.S. 312, 320 (1986); *see DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001). That the officials intended to only expose Hill to the gas—and Redmond and the other prisoners were thus secondarily exposed to it—does not transform this into a conditions-of-confinement claim. Which framework applies turns not on whom the force was applied to but, rather, on why the officials deployed the force in the first place. *See Whitley*, 475 U.S. at 320–21. And we use the excessive-force framework whenever prison officials "mak[e] and carry[] out decisions involving the use of force to restore order in the face of a prison disturbance." *Id.* at 320. The decision to deploy CS gas indisputably involved the use of force to restore order, so we employ the excessive-force framework.[3]

_____

[3] Even if Redmond were correct that the conditions-of-confinement framework governed, the officials would still be entitled to qualified immunity. Conditions-of-confinement claims have two prongs: (1) an objective prong, under which the alleged injury must be sufficiently serious, and (2) a subjective prong, under which the prison official who imposed the condition must have done so with deliberate indifference. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be

(continued...)

Nicholes and Powell are entitled to qualified immunity on the claim they used excessive force by exposing the prisoners to gas. Redmond fails to meet his burden of showing a constitutional violation occurred. And even assuming the officials did, in fact, violate the Eighth Amendment, Redmond fails to show this right was clearly established.

### a. Constitutional Violation

"[A]n excessive force claim involves two prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Giron v. Corr. Corp. of America*, 191 F.3d 1281, 1289 (10th Cir. 1999). An official has a culpable state of mind if he uses force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21.

Redmond fails to meet his burden of proving Nicholes and Powell acted with the subjective intent required to use excessive force. The record reveals the

---

³(...continued)
aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Redmond cannot show the officers acted with the subjective intent required for a conditions-of-confinement claim. At most, the record reveals negligent conduct. And deliberate indifference "describes a state of mind more blameworthy than negligence." *Id.* at 835.

-10-

defendants inadvertently—not intentionally or maliciously—exposed the prisoners to CS gas. And accidently deploying force is antithetical to deploying that force maliciously or sadistically. *Compare DeSpain*, 264 F.3d at 978–80 (10th Cir. 2001) (holding a prison official would act maliciously and sadistically by indiscriminately spraying pepper spray along a prison tier as a practical joke), *with Gargan v. Gabriel*, 50 F. App'x 920, 923 (10th Cir. 2002) (unpublished) (concluding prison officials did not act with deliberate indifference when they exposed a prisoner with a heart condition to pepper spray, but did not know the spray would aggravate his heart condition). Simply put, because the record demonstrates the prison officials inadvertently exposed the prisoners to gas, they could not have done so with malicious or sadistic intent.

Redmond argues that whether the "exposure was truly inadvertent" is a jury question, so we must accept Redmond's alleged version of the facts—Nicholes and Powell intended to gas *all* the prisoners, not just Hill. Aplt. Br. at 47. But because we are beyond the pleading stage, we will only accept Redmond's version of the facts if a reasonable juror could believe it. *See Holmes*, 830 F.3d at 1136. Redmond argues a jury could infer the officers intended to gas all the prisoners, not just Hill, because the officers knew the HVAC unit existed, knew the harmful effects of CS gas, knew the gas should not be deployed in small spaces near buildings and hospitals because it could easily disperse, and would have seen the HVAC unit because it was large and conspicuous.

-11-

But after reviewing the record, we conclude that no reasonable juror could believe the officers intended to expose any prisoner besides Hill to gas. Indeed, Nicholes testified that he did not notice the HVAC unit before deploying the gas. And after deploying the gas, Powell exclaimed the "one thing we didn't plan on is where is the intake air for this HVAC system." App. at 133. The gas getting drawn into the intake vent, moreover, caused significant trouble for the officials. The gas went into administrative areas—thus exposing those prison officials to gas—and required a large-scale evacuation of the prison. Given all this, Nicholes's and Powell's generalized knowledge about the HVAC system and CS gas's intended uses and effects are insufficient to create a jury question about their intent.

Redmond also argues that because the officers used excessive force against Hill by subduing him with CS gas, the officers also employed excessive force against all the prisoners exposed to the gas. But even assuming an excessive-force claim is transferable in this way, Redmond fails to show the officers maliciously and sadistically deployed force against Hill.

To determine whether prison officials applied force maliciously and sadistically or, rather, in good faith, we consider (1) the need for the force, and (2) whether the officers used a disproportionate amount of force. *See Whitley*, 475 U.S. at 321. Redmond argues both factors support the inference that the officers deployed the gas maliciously and sadistically. For several reasons, we disagree.

-12-

First, the prison officials needed to use force. Hill had, after all, locked himself inside the recreation yard and refused to comply with prison officials' orders.[4] Redmond makes much of the fact that Hill had allegedly thrown his sharpened glasses over the wall, leaving him unarmed. And he argues our summary-judgment standard of review requires us to assume the officers knew Hill was unarmed. Even assuming they knew Hill had no weapon before deploying the gas—which they deny—it matters not. Armed or not, prisoners "cannot be permitted to decide which orders they will obey, and when they will obey them." *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984).

Second, Redmond argues the officers used a disproportionate amount of force. Specifically, he claims the force employed must be disproportionate because it "was so great that over one hundred innocent Prisoners' cells were doused in CS gas." Aplt. Br. at 35. To be sure, it would be disproportionate to *intentionally* expose over one-hundred prisoners to gas just to secure one prisoner. In such a case, the ends would not justify the means. But that intention, of course, is not present in this case. Rather, the record demonstrates the officials inadvertently exposed the other prisoners to gas. So the question, then, is whether

---

[4] Redmond claims Hill did not "refuse[] to comply with commands" because "it was unclear what Hill was being commanded to do." Aplt. Br. at 34. We disagree. Indeed, Hill reacted to the commands by giving Nicholes the finger and saying "F*** you, fascist." App. at 288. We think this reaction is as clear an indication as any that Hill had no plans to comply with the orders.

-13-

it was disproportionate to use CS gas to secure Hill, when the officers did not realize other prisoners would be incidentally exposed to the gas as well.

Against the backdrop of the deference we afford prison officials in these situations, we cannot conclude it was disproportionate to use CS gas. Indeed, when prison officials must act to "preserve internal order and discipline," we afford them "wide-ranging deference." *See Whitley*, 475 U.S. at 320–21. This deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Id.* at 322. And here, the record demonstrates Nicholes considered other ways to subdue Hill, but ultimately chose to use CS gas because the other options involved too great a risk to prison staff.[5] We therefore must defer to that "considered choice." *Id.*

### b.      Clearly Established

Even if we assume a constitutional violation occurred, moreover, the officers would still be entitled to qualified immunity because no case clearly establishes this right. To prove "the contours of an excessive-force claim . . . were well established," Redmond cites *Whitley* for the general proposition that

---

[5] Redmond claims from "the very beginning Nicholes had decided and received permission to use CS gas." Aplt. Br. at 8. True, before considering other ways to secure Hill, Nicholes told his supervisor he would "probably be using CS gas." App. 857. But the fact that Nicholes thought he would ultimately decide to deploy gas does not undercut or somehow invalidate his subsequent consideration of different options.

"'conduct that does not purport to be punishment at all' violates the Eighth Amendment if it involves the 'unnecessary and wanton infliction of pain.'" Aplt. Br. at 48 (quoting *Whitley*, 475 U.S. at 312, 319). We certainly agree with this proposition in the abstract, but *Whitley* did not involve even remotely similar facts. *See Whitley*, 475 U.S. at 317–19 (examining whether a prison official used excessive force when he shot a prisoner in the knee while trying to quell a prison riot).

And although *Whitley* repeats the Eighth Amendment's general framework, the Supreme Court recently reminded us that it is a "longstanding principle that clearly established law should not be defined at a high level of generality." *White*, 137 S. Ct. at 552. General legal standards therefore rarely clearly establish rights. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). They only do so in "an obvious case." *White*, 137 S. Ct. at 552. That is, a case in which the "contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741; *see, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). This is no such case.

Indeed, *White* is instructive. In that case, the Supreme Court reversed our circuit's conclusion that a right was clearly established. *White*, 137 S. Ct. at 552. Our circuit erred, the Court explained, by relying on cases which laid out "excessive-force principles at only a general level" to clearly establish the right, rather than "identify[ing] a case where an officer acting under similar

-15-

circumstances" violated that right.  *Id.*  Redmond asks us to repeat this same mistake.

Nor do the most factually similar cases from our circuit clearly establish that inadvertent exposure to gas violates the Eighth Amendment.  To the contrary, in *Gargan*, a non-precedential unpublished decision, we held spraying an unarmed prisoner secured in his segregation cell with pepper spray did not violate the Eighth Amendment.  50 F. App'x at 923.  And in *DeSpain*, we held it would violate the Eighth Amendment to "indiscriminately" spray a prison tier with pepper spray as a practical joke.  264 F.3d at 978–80.  Neither case clearly establishes that it violates the Eighth Amendment to use CS gas to secure an uncooperative prisoner and, in doing so, inadvertently expose other prisoners to the gas.

In sum, Nicholes and Powell are entitled to qualified immunity on the claim they violated the Eighth Amendment by exposing the prisoners to CS gas.  Redmond cannot establish that the officers violated the Eighth Amendment and, even assuming they did, the right would not be clearly established.

### 2.    *Deliberate Indifference to Serious Medical Needs*

Redmond next contends Powell acted with deliberate indifference to prisoners' serious medical needs in violation of the Eighth Amendment.

"[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  To establish

an Eighth Amendment claim based on inadequate medical care, the prisoner must prove both an objective component and a subjective component. *Self v. Crum*, 439 F.3d 1227, 1230–31 (10th Cir. 2006). The objective component requires showing the alleged injury is "sufficiently serious." *Id.* at 1230. A delay in medical care is only sufficiently serious if "the plaintiff can show the delay resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). A "lifelong handicap, permanent loss, or considerable pain" may satisfy the substantial harm requirement. *Id.*

The subjective component requires showing the prison official "knew [the inmate] faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it." *Martinez v. Beegs*, 563 F.3d 1082, 1088–89 (10th Cir. 2009). The subjective prong is met if prison officials "intentionally deny[] or delay[] access to medical care or intentionally interfere[] with the treatment once prescribed." *See Estelle,* 83 F.3d at 104–05.

Redmond claims Powell acted with deliberate indifference to the prisoners' serious medical needs in two ways: (1) by not allowing the prisoners to leave their cells to get fresh air or to shower, and (2) by discouraging them from seeking medical attention. Even assuming these allegations are true, qualified immunity shields Powell from liability.

### a. Access to Fresh Air and Showers

On the fresh-air claim, Redmond fails to show a constitutional violation occurred. Redmond makes two separate arguments as to the prisoners in Sections B and C and those in Sections A and D.

First, since Powell did not evacuate the prisoners in Sections B and C until Hill was secured, Redmond argues Powell acted with deliberate indifference to the prisoners' serious medical needs by failing to promptly evacuate them from their cells. But Redmond offers no evidence that satisfies the subjective prong of a medical neglect claim. Nor does the record support a finding that any prisoner was substantially harmed by the officer's conduct. In fact, the record demonstrates that rather than disregard the risks prisoners in Sections B and C faced by remaining in their cells after the gas was released, Powell did his best to swiftly evacuate them. Just minutes after the gas was released, Powell ordered the opening of doors to air the facility out. And once the special operations team secured Hill—about ten minutes after the gas was deployed—Powell ordered Sections B and C evacuated.

Redmond makes much of this ten-minute delay. In his view, the fact that Powell did not immediately order the facility evacuated demonstrates he acted with deliberate indifference. We disagree. Given the circumstances, we find it wholly unsurprising that Powell did not immediately order a full evacuation. After all, not only did the HVAC unit drawing in gas surprise Powell, but he also had a

-18-

more pressing problem to deal with—securing Hill. Once Hill was secured, Powell ordered the evacuation. Thus, Powell's delay in ordering the evacuation does not suggest he acted with deliberate indifference.

Second, Redmond argues that Powell acted with deliberate indifference to the medical needs of the prisoners in Sections A and D because he did not evacuate them at all. Instead, to flush the gas out of their cells, he opened the cells' ports and placed an industrial fan by the door. Even assuming this violates the Eighth Amendment, Redmond cites nothing that clearly establishes this right. Nor would it be obvious to every reasonable prison official that to decontaminate prisoners exposed to gas, the Eighth Amendment requires removing the prisoners from their cells, rather than opening their cells' ports and placing a fan by the door. *See Mullenix*, 136 S. Ct. at 308. This right is therefore not clearly established.

On the shower claim, even assuming that failing to allow all prisoners to shower violates the Eighth Amendment, Redmond cites no case clearly establishing this right.

### b. *Discouraging Prisoners from Seeking Medical Treatment*

Redmond forfeited his argument that Powell violated the Eighth Amendment by discouraging prisoners from seeking medical assistance because he

inadequately briefed it.[6]  Arguments are forfeited when they rest on bare assertions and cursory arguments made in the opening brief.  *See, e.g.*, *Leathers v. Leathers*, 856 F.3d 729,750–51 (10th Cir. 2017).  Redmond's argument is cursory, and he fails to explain what sufficiently serious injury the prisoners suffered.

Even if Redmond had not forfeited this claim, qualified immunity would shield Powell from liability because Redmond proffers no evidence that satisfies the objective component of a medical neglect claim.  Redmond claims prisoners did not seek medical attention because Powell discouraged them from doing so.  Assuming this is true, to satisfy the objective component of a medical neglect claim Redmond must show that this denial of medial care caused a sufficiently serious injury.  He has not done so.

To be sure, the prisoners were injured by being exposed to CS gas.  But that injury is the subject of the excessive-force claim we have already addressed.  Redmond never alleges what injury could be caused by not seeing medical staff *after* being exposed to gas.  In fact, Redmond's brief repeatedly notes that the decontamination process for gas exposure involves showering and exposure to fresh air, thus suggesting medical professionals could not have even alleviated the

---

[6]  In his opening brief, Redmond has only one conclusory sentence on this claim.  Aplt. Br. at 44.  He also summarily states that Powell "discouraged Prisoners from seeking [medical attention]" and there was "no legitimate penological purpose to . . . actively discourage or disallow proper . . . medical attention."  *Id.*  All of these statements are within a section entitled "Powell violated the Prisoners' Eighth Amendment rights by denying them access to fresh air and irrigation after the CS gas exposure."  *Id.* at 43.

prisoners' symptoms through some sort of professional medical care. And we are aware of no prisoner who, in fact, asked for medical care and had it denied.

In sum, Redmond forfeited his claim that Powell acted with deliberate indifference to the prisoners' serious medical needs in violation of the Eighth Amendment. And had Redmond not forfeited this claim, Powell would nonetheless be entitled to qualified immunity.

### 3. Other Eighth Amendment Claims

Redmond makes two additional Eighth Amendment claims we can easily dismiss.[7] First, he argues Nicholes and Powell created an unconstitutional condition of confinement by insulting and intimidating the prisoners. But the objective component of a conditions-of-confinement claim requires Redmond to allege a condition that is either "sufficiently serious so as to deprive inmates of the minimal civilized measure of life's necessities" or "constitute[s] a substantial risk of serious harm." *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001). All Redmond cites for the proposition that isolated insults meet either requirement is a Supreme Court concurrence no other Justice joined. *See Hudson v. McMillian*, 503 U.S. 1, 16 (Stevens, J., concurring in part and concurring in the judgment).

---

[7] Redmond also argues Powell created an unconstitutional condition of confinement by failing to "establish prompt, verbal contact with inmates" after the gassing to "alleviate their panic and anxiety." Aplt. Br. at 44. We can easily dismiss this argument, however, as Redmond cites no case to show this violates any constitutional right, much less a clearly established one.

He thus falls far short of meeting his burden of proving a constitutional violation occurred.

Second, Redmond argues Nicholes and Powell created an unconstitutional condition of confinement by failing to adequately train prison staff on the use of CS gas. But even assuming this violates the Eighth Amendment, Redmond fails to cite anything that clearly established this right. Indeed, his brief cites only the general conditions-of-confinement standard laid out in *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). And as we discussed above, general propositions of law usually do not clearly establish rights. *See, e.g.*, *Ashcroft*, 563 U.S. at 742.

### C.     Utah Constitution Claims

Lastly, Redmond claims Powell, Nicholes, and Crowther violated the Utah Constitution's unnecessary-rigor clause by exposing the prisoners to CS gas. The clause, a variation on excessive-force principles, states that "[p]ersons arrested or imprisoned shall not be treated with unnecessary rigor." Utah Const. art. I, § 9.

To recover under the clause, Redmond must establish, among other things, that the prisoners suffered a flagrant violation of their constitutional rights. *See Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465, 478 (Utah 2011).[8] The Utah Supreme Court has explained that conduct must be "more than negligent" to flagrantly violate the unnecessary-rigor clause. *See Dexter v. Bosko*, 184 P.3d

---

[8] To recover monetary damages under the Utah Constitution, Redmond would also need to show that existing remedies do not redress his injuries and equitable relief would be inadequate. *See Cunningham*, 250 P.3d at 478.

592, 597 (Utah 2008). Redmond's Utah Constitution claim thus fails for the same reason as his Eighth Amendment claims: the prison officials' conduct inadvertently—or, in other words, negligently—exposed the prisoners to gas.

Redmond also sues Crowther in his official capacity and asks that we enjoin Crowther and direct him to adopt and comply with written policies regarding the deployment of gas. But Redmond lacks standing to sue for injunctive relief. "Plaintiffs have the burden to demonstrate standing for each form of relief sought." *Lippoldt v. Cole*, 468 F.3d 1204, 1216 (10th Cir. 2006). And if a plaintiff seeks injunctive relief based on the threat of future harm, the "threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983).

Redmond argues he has standing to sue for injunctive relief because the defendants are "disregarding an objectively intolerable risk of harm" that a similar situation with CS gas may occur. Aplt. Br. at 55. Yet he offers just speculation that a similar incident will occur. True, Redmond claims the prison has failed to "adopt[] a formal policy regarding the steps that should be undertaken to protect innocent prisoners from secondary exposure." *Id.* But Nicholes has implemented a new procedure on his team to "take into account the HVA[C] system." App. 865. Given this, Redmond's argument that a similar incident will occur is "contingent upon speculation or conjecture" and thus "beyond the bounds of a

federal court's jurisdiction." *Lippoldt*, 468 F.3d at 1218. Redmond therefore lacks standing to sue for injunctive relief.

In sum, Redmond's claim for monetary damages and injunctive relief under the Utah Constitution fails.

## III.  Conclusion

The district court properly granted summary judgment.  Redmond forfeited his claim based on Powell discouraging prisoners from seeking medical attention, and Powell and Nicholes are entitled to qualified immunity on all of Redmond's other Eighth Amendment claims.  Redmond cannot sue for damages under the Utah Constitution because he failed to show Powell and Nicholes flagrantly violated the Utah Constitution.  And Redmond lacks standing to sue for injunctive relief under the Utah Constitution.

We accordingly AFFIRM.