**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 5, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

CHRISTINA ROSSI,

     Plaintiff - Appellee,

v.

F. EDWARD DUDEK, an individual, in
his official and individual capacities;
KRISTEN A. KEEFE, an individual, in her
official and individual capacities; JOHN A.
WHITE, an individual, in his official and
individual capacities,

     Defendants - Appellants,

and

UNIVERSITY OF UTAH, Utah state
educational institution; JEFFREY J.
EKSTRAND, an individual, in his official
and individual capacities; BRADLEY
GREGER, an individual, in his official and
individual capacities; JEFFREY BOTKIN,
an individual, in his official and individual
capacities; and DOES 1 through 25,
inclusive,

     Defendants.

No. 20-4062
(D.C. No. 2:15-CV-00767-CW-DAO)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MORITZ**, and **EID**, Circuit Judges.
_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

_____

Christina Rossi was a Ph.D. student at the University of Utah from 2008 until 2014. Her dissertation committee dismissed her for failing to meet academic standards and the administrative appeals process upheld that decision. Rossi sued, alleging a due process violation, and the district court denied qualified immunity to several members of her committee. They now appeal. Exercising jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1291, we reverse the denial of qualified immunity.

## I.

### a.

When reviewing the denial of a summary judgment motion asserting qualified immunity, we must accept "the district court's conclusions as to what facts the plaintiffs may be able to prove at trial." *Fancher v. Barrientos*, 723 F.3d 1191, 1194 (10th Cir. 2013). Construing the evidence in the light most favorable to Rossi, the district court determined that a reasonable jury could find the following facts.

Christina Rossi attended Boston University ("BU") for college. During her freshman year, Rossi began working in the laboratory of Dr. Michael Hasselmo, a BU professor. After Rossi obtained her bachelor's degree, she entered BU's Ph.D. program and continued in Hasselmo's lab. Two years later, she withdrew from the program. According to Rossi, another graduate student treated her like a technician, which interfered with her work. Although she brought the issue to Hasselmo's attention, he declined to address it. Because of this, and because she was working on

2

a "fluff project" that had run out of funding, she opted to depart, having earned a master's degree. App'x Vol. VII at 1618.

Rossi still wanted to pursue a Ph.D., and Dr. Raymond P. Kesner's lab at the University of Utah ("University") caught her attention. Rossi believed working in Kesner's lab would be "a natural extension of . . . the general area that [she] was working with . . . in the Hasselmo Lab," and her understanding was that Kesner "had a good relationship with the Hasselmo Lab." App'x Vol. V at 1036–37. Rossi applied to the University's Interdepartmental Neuroscience Program.

Dr. John A. White, a bioengineering professor at the University who worked at BU until 2007, had heard that Rossi's time in BU's Ph.D. program had not gone well. Hasselmo told White that Rossi was a "mediocre" or "poor" student who would "struggle in many environments." *Id.* at 1057. But Hasselmo also said that the University was a good fit for Rossi and that he was uncomfortable arguing that she should not be admitted. White reported these concerns to the program director at the University, and Rossi was admitted.

In 2008, Rossi matriculated at the University. She started in Kesner's lab, where she studied learning and memory in rats. During her second year, she switched to the lab run by Dr. F. Edward Dudek, a professor in the University's Department of Neurosurgery. Rossi asked Dudek, Kesner, White, Dr. Kristen A.

Keefe,[1] and Dr. Bradley E. Greger to serve on her dissertation committee.  Keefe was a professor in the University's College of Pharmacy and the Director of the Interdepartmental Program in Neuroscience.  Greger was brought on for his expertise with analyzing electrical signals.  Dudek chaired the committee and became Rossi's mentor.

Until early 2013, by all accounts, Rossi succeeded at the University.  She earned good grades.  She received a stipend.  She represented Dudek's lab at a neuroscience conference.  According to her committee, Rossi was making progress and would likely defend her dissertation—essentially the final step toward receiving her Ph.D. degree—by mid-2013.

Rossi obtained several glowing letters of recommendation from committee members during this time.  Keefe wrote two such letters.  In the first, she stated that, "relative to other graduate students at this stage in their development," Rossi stood out.  *Id.* at 1051.  In the second, Keefe characterized Rossi's work as "scholarly, well[]written," and "well defended by reference to the literature or her own research findings."  App'x Vol. VI at 1248.  Dudek wrote Rossi a letter of recommendation to support her application for a post-doctoral position at the Massachusetts Institute of Technology ("MIT").  In the letter, Dudek said that Rossi's experiments were unique and would yield interesting results.  Rossi was "a dedicated and thoughtful

---

[1] Keefe's first name is misspelled as "Kristin" throughout this litigation, including in the caption on appeal.  We use the correct spelling in this order, and direct the Clerk's Office to correct the case caption as well.

researcher," as well as "a hard worker who . . . works well with others and is well[]liked and highly respected." *Id.* at 1250. Rossi received the post-doctoral position, pending the outcome of her dissertation defense.

White wrote a letter to support Rossi's application for a fellowship to fund the MIT position. He described Rossi's research as "a challenging project, involving elaborate surgeries, instrumentation, data collection and processing, and immunocytochemistry." *Id.* at 1364. Rossi had "systematically mastered these disparate techniques," and "[t]he results and quality of the story [we]re more impressive at each committee meeting." *Id.* Rossi did not get the fellowship.[2]

Around this time, Dudek co-invented the "Epoch," a wireless recording device that could obtain electrophysiological data from animals. Dudek partnered with the University's Technology Commercialization Office to develop it. Dudek claims this was "a scientific endeavor" and he "never really thought [he was] going to make any money selling telemetry devices for rats and mice." App'x Vol. V at 1192. However, the University determined that the device had commercialization potential, so those involved could gain financially from its success, which would create pressure to produce favorable results. In 2009, Dudek received a grant from the National Institutes of Health ("NIH") to study Epoch. The grant required Dudek to "have a written administrative process to identify and manage financial conflict of

---

[2] White later tried to retract this letter of recommendation.

interest and [to] inform [researchers] of the conflict of interest policy." App'x Vol. VI at 1220.

Dudek created Epoch as Rossi's dissertation was undergoing significant changes. Rossi began with a focus on learning and memory, which she had been studying since BU. At Dudek's direction, Rossi eliminated all components of her project involving memory and shifted focus to whether interneuron loss in a certain area of the hippocampus caused progressive epilepsy. This was a generally accepted hypothesis in Dudek's area of interest. To test it, Dudek pushed Rossi to record her data with Epoch rather than a traditional tethered device, and to use mice instead of rats. The switch to mice was important because Epoch had not been validated in mice for Rossi's intended use. If Epoch worked, that would help Dudek. But Epoch was a risk for Rossi if it failed. Rossi also later learned that Dudek did not expect the studies that used Epoch during this time to produce publishable findings.

Rossi was aware of Dudek's stake in Epoch, but claims she did not know the device was in a "primitive" state. App'x Vol. V at 1122. Despite the NIH requirements, Dudek did not provide Rossi with formal notice of his Epoch conflict until after she had completed her data collection. The notice informed Rossi that she could use a different device for her experiments. Because Rossi had already completed her data collection by this point, switching to another device would have required her to restart. In late 2012, Rossi reported to Dudek that, contrary to their hypothesis, the experimental treatment did not induce seizures.

6

In September 2012, Rossi's committee indicated that she would likely complete her degree in June 2013. But in October 2012, Dudek started to take a contrary view. He told White over email that he thought Rossi would need more time to address issues the committee identified. In a letter submitted on Rossi's behalf the same month, Dudek stated that Rossi would "probably need another year to complete the studies and write two or three full-length papers." App'x Vol. VI at 1250. Around this time, Rossi began to feel that Dudek's support was fading, and she reports that they had minimal contact over the next five or six months; Dudek disputes her account. On April 2, 2013, Dudek finally gave Rossi feedback on the key papers she was preparing for her dissertation project.

On April 10, 2013, the submission deadline for Rossi's dissertation was near, with her defense scheduled for April 25. Rossi had recently rearranged her committee, replacing Kesner with Dr. Jeffrey J. Ekstrand, a professor who specialized in seizures. Dudek was out of town and had not reviewed Rossi's latest revisions. Rossi emailed the other committee members, asking if they wanted to see her papers anyway. On April 15, 2013, Rossi asked White how she should proceed. White advocated for postponing the defense and suggested talking to Keefe. Keefe recommended asking others to review the project. Keefe also warned Rossi that, without responding to feedback, she risked failing the defense. Rossi told Keefe that other Dudek lab members had been involved, and that Dudek himself had reviewed the dissertation with her that night.

On April 16, 2013, Dudek emailed Rossi with several serious concerns about her dissertation. Dudek urged Rossi to postpone her defense, saying it would not impact her postdoctoral fellowship because a delay "happens all the time." *Id.* at 1386. Dudek claimed he had previously questioned whether defending before November 2013 would be feasible. He said that while the committee would be fair, the defense would be rigorous.

Rossi ignored her mentors' recommendations to postpone. She complained to Dudek that she had "tried multiple times to . . . get some in-depth guidance" from him, but he had not been available. *Id.* at 1385. She explained she was prepared to defend her project and believed the committee members knew epilepsy was not her "main field." *Id.* On April 19, 2013, Rossi told Dudek that all other members of her committee supported her proceeding to her defense without delay. She claimed that they considered her work "enough to graduate, and that they [did not] anticipate any problems with [her] writing." *Id.* at 1407.

On April 22, 2013, three days before the defense, Dudek accused Rossi of falsifying data and told her that she could no longer access his lab without an escort. Rossi reported this to Keefe and White, seeking their help. Keefe responded that neither she nor White could resolve the problem because they were both on Rossi's committee. Keefe advised Rossi and Dudek to "work civilly together to reach" a solution and, if that failed, contact University administration. *Id.* at 1405. Keefe also told Rossi and Dudek to decide whether Rossi's defense should proceed as planned. Dudek replied twenty minutes later. He quoted from Rossi's April 19, 2013, email

8

that incorrectly claimed that the entire committee supported Rossi proceeding with her defense, saying: "You all have made a decision, and it is clear that you all want to go forward." *Id.* at 1407. Later that evening, White responded, stating: "This situation is unprecedented in my career. If the defense goes forward, I will do my part. However, I want to go on record that this defense should be postponed (if necessary) until [Rossi and Dudek] agree that the work is ready to defend." *Id.* at 1409.

These developments impacted how the committee members saw Rossi. In White's view, Rossi acted in a "slippery and manipulative" manner because "she went to committee members individually and told [them] different stories." App'x Vol. VII at 1596–97. He also believed Rossi misrepresented Dudek's availability. Her conduct "reflected poorly on her professional character." *Id.* at 1597. And White had already been hesitant to serve on Rossi's committee, having never let go of his concerns about her time at BU. Meanwhile, Keefe felt Rossi had engaged in "a blatant misrepresentation" about committee members' positions on delaying Rossi's defense. App'x Vol. V at 1076.

Despite the growing tension, Rossi went forward with her dissertation defense as scheduled. On the day of the defense, Dudek emailed Vicki Skelton, an administrative assistant. Dudek told Skelton that he thought the defense would be "unpleasant," but he would "hold [his] nose and try to 'do the right thing.'" App'x Vol. VI at 1416. Although he had considered resigning from the committee, he indicated he was leaning against it and would see how the defense went. Dudek

9

stated: "I am almost certainly going to vote to fail, because [Rossi] does not have an adequate thesis." *Id.* Dudek was not the only committee member with concerns. White later called Rossi's submission the "worst dissertation [he] had ever read." App'x Vol. V at 1062.

Rossi's defense went poorly. White called it the "worst defense [he] had ever attend[ed]." *Id.* Asked how many days of seizure data she analyzed, Rossi replied (according to the committee) that she analyzed seizure data for only the fifth day. Rossi contends that she said she analyzed all thirty days of recorded data, but "had observed seizures mainly on the fifth day of experimentation, hence the figure focusing on that day." *Id.* at 1123. The evidence supports Rossi's position that she analyzed more than a single day's data, but the impression that Rossi analyzed only day-five data proved fatal. White called it "an extremely important moment that led to . . . her failure at the defense." App'x Vol. VII at 1600. Keefe similarly described that moment: "We were all floored by the fact that [Rossi] answered . . . she had only analyzed day five, because that was not the impression given at all the way she wrote her dissertation." App'x Vol. IV at 546.

Based on the perceived weaknesses in Rossi's dissertation and the misunderstanding about day five, the committee did not let Rossi proceed to the oral examination. Because Rossi had expressed concerns about Dudek's mentorship, the committee agreed not to formally fail her. Instead, the committee gave Rossi the first of several second chances, clarifying its concerns in writing and providing feedback on how to fix the problems identified at the defense. Keefe informed Rossi that she

could no longer contact committee members individually. All communications were to be sent to the entire committee because it was clear that Rossi had misrepresented committee members' views.

Over the next six months, Rossi attempted to improve her dissertation, but her efforts were largely unsuccessful. She had limited authorization to use Dudek's lab, and was denied access to her data for about a month. Meanwhile, the advice Rossi received about what steps to take and what methodological techniques to use to improve her dissertation was sometimes difficult to follow. On November 20, 2013, the committee dismissed Rossi from the program. Keefe promised a formal letter of dismissal that would explain the decision.

Before such a letter was sent, Dudek spoke with the University's general counsel. On the advice of counsel, the committee concluded it needed to give Rossi (1) "another chance with very clearly defined dates and expectations" and (2) "written warning that her performance" was "not meeting academic standards." *Id.* at 557. On November 22, 2013, Keefe informed Rossi that the committee had engaged in "considerable additional deliberation" and "decided to not move forward with dismissal." App'x Vol. II at 345. Keefe attached a letter detailing the committee's expectations going forward and setting deadlines for Rossi's progress. The committee never revealed its concern that it could not legally dismiss Rossi without giving her another chance.

On November 27, 2013, Rossi filed a grievance with the University stating that her committee was not providing her "clear support, feedback, and constructive

11

criticism." *Id.* at 353. She incorrectly maintained that the committee had supported her proceeding with her scheduled defense, and that she had received no negative feedback on her suggested plan.

On December 9, 2013, the first deadline set by the November 22 letter, Rossi submitted another draft of her methods section to the committee. Several committee members expressed concerns over email. Keefe pointed out that the committee had, back in July, approved parts of Rossi's approach. Keefe asked if the committee was "obligated to help" Rossi by "provid[ing] a bit more direction." App'x Vol. III at 416. Dudek responded that it was clear what methods Rossi should use, as he had told Rossi to use them before her defense. Keefe and the rest of the committee informed Rossi that the methods needed more work.

The committee was also not impressed by the next round of submissions under the plan set out in the November 22 letter. Over email, White called Rossi's revisions "rote and uninspired," saying he could not understand how she made so little progress since the defense.[3] App'x Vol. VI at 1497. In his view, Rossi did the "bare minimum," described questionable methods, and did not support her conclusions with analysis. *Id.* He reminded the committee members that she

---

[3] We can recount additional comments in emails quoted by the district court in part, as well as replies from fellow committee members, even though the district court did not specifically cite these details below. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008) ("Those facts explicitly found by the district court, combined with those that it likely assumed, then form the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity.").

defended against their advice, and catalogued repeated "evidence of low character,"

including her misrepresentations about committee members' positions, the

"circumstances under which she left BU," and an "infamous Facebook posting." *Id.*

He concluded that Rossi was "not capable of the level of independent work needed

for a PhD." *Id.* While he was open to being persuaded otherwise, in his opinion the

"time ha[d] come to remove her from the PhD program." *Id.* Ekstrand agreed. As

did Dudek. Keefe summed up the situation: "I think we all know what the next step

is." *Id.* at 1500. The committee dismissed Rossi from the program on January 13,

2014. By letter, it informed her that (1) she had "failed to demonstrate competence

in independent research," (2) her work since the defense was untimely, and (3) she

lacked professional character. App'x Vol. IV at 456. The dismissal letter did not

allude to the concerns that White had about her time at BU, or that Dudek had raised

about academic integrity.[4]

After the committee dismissed Rossi, she appealed the decision internally,

following the University's established administrative procedures.[5] Rossi's appeal

---

[4] In the months leading up to Rossi's dismissal, Dudek had formally, but privately, accused Rossi of falsifying data. In November 2013, Dudek contacted the University's Research Integrity Officer, Dr. Jeffrey Botkin, concerned that Rossi did not have some of the data that she claimed supported her thesis. Dudek was simultaneously attempting to obtain Rossi's data and analysis for potential future use by his lab. In December 2013, Botkin told Dudek that he would not pursue the allegations against Rossi further; the alleged flaws in her research that Dudek brought to his attention would not amount to academic misconduct under University policy.

[5] We discuss Rossi's administrative appeals in somewhat greater detail than the district court because they are important to understanding the process Rossi received. *See id.*

went through three different levels: first, to Dr. Richard I. Dorsky, the Director of the Interdepartmental Program in Neuroscience; then, to the Academic Appeals Committee for the School of Medicine, which made a recommendation to Dr. Dean Y. Li, Associate Vice President for Research and Chief Scientific Officer, Health Sciences; and finally, to Dr. Vivian S. Lee, Senior Vice President for Health Sciences and Dean of the School of Medicine.  As part of the monthslong appeals process, Rossi received a hearing at which she was represented by counsel.  The committee's initial decision to dismiss Rossi was affirmed at each level of the appeal.  In the end, Dean Lee concluded that Rossi was dismissed due to "her continuing failure to meet the Program's academic requirements," specifically her "failure to attend to the substantive feedback she was given by experienced scientists and mentors," and her "inability to analyze her data and tie her conclusion to the data in the appropriate scholarly fashion necessary to obtain a Ph.D. degree." *Id.* at 472–73.  Dean Lee stated that the members of Rossi's committee had "strong established track records of mentoring graduate students," and their decision "was neither arbitrary nor capricious." *Id.*

**b.**

In October 2015, Rossi sued, among others, the members of her committee. She alleged that they violated her Fourteenth Amendment due process rights when they dismissed her.  The district court dismissed Greger, Ekstrand (in his individual capacity), and the University.  Dudek, Keefe, White, and Ekstrand (in his official capacity) moved for summary judgment, asserting qualified immunity.  The district

14

court dismissed all four in their official capacities, which left Dudek, Keefe, and White in their individual capacities. The court found that Rossi's due process claims failed to the extent they were premised on stigmatization or an infringement of her liberty interests. But it concluded that Rossi had a protected property interest in continued enrollment in the Ph.D. program. It held that Dudek, Keefe, and White violated clearly established law pertaining to academic dismissals. Dudek, Keefe, and White appeal. *See Morris v. Noe*, 672 F.3d 1185, 1188–89 (10th Cir. 2012) (denial of qualified immunity is immediately appealable under collateral order doctrine).

## II.

Dudek, Keefe, and White maintain that the district court erred for two reasons. First, they argue that Rossi's clearly established rights were not violated because "the University . . . gave Rossi extensive process" by allowing her to pursue an "academic appeal . . . through [multiple] different levels." Aplt. Br. at 43–44. Second, they contend that, even ignoring the administrative appeals, their own conduct did not violate clearly established law. We begin by discussing the applicable legal framework. We then resolve this appeal on the first ground without reaching the second.

### a.

This appeal turns on qualified immunity. "[T]he doctrine of qualified immunity shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates clearly

established statutory or constitutional rights." *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021) (alteration in original) (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001)).  "'We employ a two-part test to analyze a qualified immunity defense,' asking 'whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of [the official's] alleged misconduct.'" *Dalton v. Reynolds*, 2 F.4th 1300, 1308 (10th Cir. 2021) (quoting *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011)). "After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).  "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Id.*  Our review is de novo.  *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  To demonstrate such foundation, "the plaintiff must point to 'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 427 (10th Cir. 2014)).  Relevant cases cannot merely suggest an answer; rather, "'existing precedent must have placed the statutory or constitutional question beyond debate' to clearly

16

establish a right." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (quoting *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)).

"The 'clearly established' standard also requires that the legal principle clearly prohibit the [official's] conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590. In other words, "[t]he rule's contours must be so well defined that it is 'clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)). "We do not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). But we do require that "the precedent . . . be particularized to the facts." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 138 S. Ct. at 590 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). That said, "'general statements of the law' can clearly establish a right for qualified immunity purposes if they apply 'with obvious clarity to the specific conduct in question.'" *Halley*, 902 F.3d at 1149 (alteration omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

**b.**

Rossi's constitutional claims sound in due process. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

A party claiming a due process violation must allege that the government "has deprived [her] of an interest in liberty or property" that is constitutionally cognizable. *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986). "A protected interest in liberty or property may have its source in either federal or state law." *Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012). On appeal, the parties do not dispute that Rossi had a constitutionally protected property interest in enrollment in her Ph.D. program that triggered the requirements of due process.

A student with a constitutionally protected interest in attending a public academic program may not be dismissed from the program without due process of law. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85 (1978). The process that is due depends on whether the dismissal is based on academic performance or is disciplinary in nature. *See Harris*, 798 F.2d at 423. Where, as here, a student is dismissed on academic grounds—another aspect of this case uncontested on appeal—our review of the decision is highly deferential. *See id.* (explaining that "less stringent procedural requirements attach" to academic dismissals). "[T]he determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Horowitz*, 435 U.S. at 90. "When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985); *see also Horowitz*, 435 U.S. at 92 ("Courts are particularly ill-equipped to evaluate academic

18

performance."); *Gaspar v. Bruton*, 513 F.2d 843, 851 (10th Cir. 1975) ("The courts are not equipped to review academic records based upon academic standards within the particular knowledge, experience and expertise of academicians.").

A student alleging a due process violation can bring a procedural or substantive challenge. Procedural due process as applied to academic dismissals ordinarily "requires no more than that 'the student [have] prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and [that] the decision to dismiss the student [be] careful and deliberate.'" *Trotter v. Regents of Univ. of N.M.*, 219 F.3d 1179, 1185 (10th Cir. 2000) (alterations in original) (quoting *Schuler v. Univ. of Minn.*, 788 F.2d 510, 514 (8th Cir. 1986)). That said, "the notion of judicial deference to academic decisions loses force when . . . the decisionmaker is 'accused of concealing nonacademic or constitutionally impermissible reasons' for its action." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001) (quoting *Ewing*, 474 U.S. at 225). Even if the requirements of procedural due process are otherwise satisfied, "the court may grant relief . . . [when] the student presents positive evidence of ill will or bad motive." *Gaspar*, 513 F.2d at 851.

Substantive due process also prohibits academic officials from dismissing a student because of improper motives. "Under Supreme Court authority, a plaintiff asserting a substantive due process claim based on an academic decision must show that the decision was the product of arbitrary state action rather than a conscientious, careful and deliberate exercise of professional judgment." *Gossett*, 245 F.3d at 1182.

19

"A plaintiff may make such a showing by evidence that the challenged decision was based on 'nonacademic or constitutionally impermissible reasons,' rather than the product of conscientious and careful deliberation." *Id.* (quoting *Ewing*, 474 U.S. at 225).

The parties suggest that the procedural and substantive due process standards are effectively the same in a case like this, as Rossi alleges she was dismissed for impermissible reasons. *See* Aple. Br. at 36; Reply Br. at 1 n.1. We agree, so we analyze Rossi's due process challenges together, focusing on whether it was clearly established that the decision to dismiss her was anything other than careful and deliberate. We conclude that, because the University provided an extensive administrative appeals process which Rossi does not directly charge with bias, Rossi cannot show that her clearly established rights were violated.

### c.

When assessing whether a dismissed student's due process rights were violated, we ask whether "the decision to dismiss the student [was] careful and deliberate." *Trotter*, 219 F.3d at 1185 (quoting *Schuler*, 788 F.2d at 514). Our focus is not on whether any given academic official's actions comported with due process in isolation—it is on whether the decision itself did so. *See id.* Our analysis thus encompasses the entire process that rendered the decision final, which includes any opportunities that the institution provided to the student to revisit or overturn it. *See id.* ("The number of appeals and review hearings afforded [the student] convince us that the [university's] decision was careful and deliberate."). The degree to which

that review process may have been compromised is critical to whether it can produce a careful and deliberate decision, as two of our cases illustrate.

In *Harris v. Blake*, a university student studying psychology withdrew from a counseling course over the professor's objection. *Harris*, 798 F.2d at 420. The professor wrote a letter calling the student "incompetent and unethical." *Id.* The letter was placed in the student's academic file, where it was seen by other instructors. *Id.* at 421. Two professors who read the letter gave the student poor grades, pushing his grade point average below the required minimum and compelling him to withdraw. *Id.* The student brought suit, claiming he had been deprived of his constitutionally protected interest in attending the academic program without procedural and substantive due process. *Id.* at 422. On appeal, we acknowledged that "[a]rguably, both the . . . letter and the poor grades [the student] received were not careful evaluations." *Id.* at 423. But the letter and the grades were not what mattered. What mattered was that the university had allowed the student to lodge an official grievance, culminating in a hearing before the university's academic appeal board. *See id.* We explained that "the procedures [the student] received were more than adequate to protect his property interest in continued enrollment" because (1) the university had "provided an established appeals procedure" that allowed Harris to "participate[] personally in the hearing to challenge his grades," and (2) that "[i]ndependent review confirmed the propriety of the grades and further demonstrated that the ultimate decision concerning his case was a careful one." *Id.* We observed that it was the decision of the academic appeal board "that ultimately

21

resulted in [the student's] forced withdrawal," and the student "failed to show that this decision was not made with conscientious deliberation through the exercise of professional judgment." *Id.* at 425.

Similarly, *Gossett v. Oklahoma ex rel. Board of Regents for Langston University* involved a student who involuntarily withdrew from a university nursing program and then brought suit, alleging due process violations. *Gossett*, 245 F.3d at 1175. The student maintained that the decision to require his withdrawal was the product of gender discrimination, so it was not careful and deliberate. *Id.* at 1181–82. We agreed with the student that he had raised a question of fact. *Id.* And, this time, it did not prove sufficient that the student had been afforded an administrative appeal. *See id.* at 1176. Although we did not address the import of the administrative appeal directly, we observed in a footnote that the appeal had been potentially tainted, as the student "claim[ed] that illegal discrimination played a role in his unsuccessful grade contest proceedings and in his failure to be readmitted." *Id.* at 1182 n.7. Under *Gossett*, an academic decision may not be careful and deliberate—notwithstanding a student's administrative appeals—where it is the product of a process "motivated by impermissible gender discrimination rather than based on an exercise of professional judgment as to . . . academic ability." *Id.* at 1182.

Viewing the evidence in the light most favorable to Rossi, this case falls, at best, somewhere between *Harris* and *Gossett*. Like in *Harris* and unlike in *Gossett*, Rossi makes no claim that the University officials who decided her administrative

22

appeals, which rendered final the decision to dismiss her, were biased or otherwise unqualified in any respect—and certainly not with respect to gender discrimination, the only impermissible motive that *Gossett* clearly establishes. However, in contrast to *Harris*, there was arguably not a completely independent review of the decision to dismiss Rossi. There appears to have been de novo review of Rossi's bias allegations. *See* App'x Vol. IV at 469. And, on the merits of the academic decision, Dean Lee stated that Rossi's dismissal "was based on failure to attend to the substantive feedback she was given" and her "inability to analyze her data and tie her conclusions to the data in the appropriate scholarly fashion necessary to obtain a Ph.D. degree." *Id.* at 472–73. But Dean Lee also afforded some deference to Rossi's committee, noting its members had "strong established track records of mentoring graduate students," and upholding the dismissal as "neither arbitrary nor capricious." *Id.* To the extent the University's administrative review reaffirmed the committee's judgment, which Rossi alleges was based on impermissible motivations, it is not implausible to suggest that the review may not have been entirely independent under *Harris*. However, this notion is undermined by the administrative reviewers' knowledge of Rossi's allegations concerning the committee's motivations.

On the merits, our typical task would be to consider the principles that underlie our past decisions and determine whether the administrative appeals in this case make it more like *Harris* or *Gossett*. Reviewing a denial of qualified immunity, however, we have a slightly different task: we must determine whether Rossi has shown a violation of her clearly established rights. To be clearly established, "[w]e

do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Precisely because, when construed most favorably to Rossi, this case sits between our relevant precedents, Rossi cannot make that showing. It was not clearly established that an administrative appeals process fails to produce a careful and deliberate decision just because it may not have involved de novo review of all aspects of an academic determination that is alleged to have been based on nonacademic factors.[6]

The district court erred by failing to consider Rossi's administrative appeals. Because of them, we need not dissect the committee's initial decision to dismiss her. Unlike in *Gossett*, Rossi raises no concern about the administrative reviewers' impartiality regarding her gender, nor any other shortcoming that our precedent clearly establishes as improper. Rossi fails to state a constitutional claim sufficient to defeat the assertion of qualified immunity. Dudek, Keefe, and White are entitled to qualified immunity.

---

[6] Rossi points to several out-of-circuit cases where, she says, courts permitted due process claims to proceed even though "the educational institution ha[d] administratively affirmed its initial discipline of the student." Aple. Br. at 41. However, as Rossi acknowledges, all these cases concerned discipline. *Id*. Our due process inquiry is much more demanding for disciplinary decisions than for academic dismissals. *See Harris*, 798 F.2d at 423.

## III.

For the foregoing reasons, we REVERSE the district court's order denying

Dudek, Keefe, and White qualified immunity.

Entered for the Court


Allison H. Eid
Circuit Judge