**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**August 25, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

DOUGLAS WINTER,

    Plaintiff - Appellant,

v.

PATRICK MANSFIELD; MELISSA
LEON; STEPHEN CHILES; BRETT
CORBY; AUSTIN DUNN; JORDAN
GLADFELTER; UNKNOWN
DEFENDANTS,

    Defendants - Appellees.

No. 21-3171
(D.C. No. 5:19-CV-03236-HLT-TJJ)
(D. Kan.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **TYMKOVICH**, Chief Judge, **MATHESON** and **EID**, Circuit Judges.
_____

Douglas Winter, a pro se Kansas inmate, brought suit under 42 U.S.C. § 1983.

He alleged that named and unnamed Defendants violated his Eighth Amendment

protection against excessive force while he was an inmate at the El Dorado

Correctional Facility (EDCF). Six of the seven named Defendants were EDCF

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

officers:  Captain Patrick Mansfield, Sergeant Melissa Leon, Corporal Stephen Chiles, Corporal Brett Corby, Corporal Austin Dunn, and Corporal Jordan Gladfelter. Mr. Winter alleged that Corporals Chiles, Corby, Dunn, and Gladfelter were liable in their individual and official capacities for using excessive force against him after he stabbed three people.  He alleged that Captain Mansfield and Sergeant Leon were liable in their individual and official capacities for failing to intervene.  The seventh named Defendant, Corizon, LLC, was the corporate provider of medical care for inmates at EDCF.  Mr. Winter alleged that Corizon failed to provide adequate medical treatment to him.  He also asserted unspecified state-law tort claims.

The district court (1) dismissed Corizon and the official-capacity claims, (2) granted summary judgment to the Defendants on the individual-capacity excessive-force and failure-to-intervene claims, and (3) declined to exercise supplemental jurisdiction over the state-law claims.  Mr. Winter appealed, challenging the district court's determination of facts, its summary judgment rulings, and its refusal to consider his state-law claims.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Factual History*

On review of summary judgment, "[w]e construe the factual record and reasonable inferences therefrom in the light most favorable to the nonmovant," *Allen v. Muskogee*, 119 F.3d 837, 839-40 (10th Cir. 1997), and "ordinarily limit[] our review to the materials adequately brought to the attention of the district court,"

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  Mr. Winter's "version of the facts must find support in the record." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (quotations omitted).

The record is extensive.  It includes video recordings, photographs, and declarations from the officers involved in the altercation, Mr. Winter's pro se complaint and affidavit, and a *Martinez* report prepared by investigating prison officials, *see Martinez v. Aaron*, 570 F.2d 317, 319 (10th Cir. 1978) (recommending the composition of an investigative report prepared by prison officials to be filed with the answer to the complaint).[1]  The record also includes affidavits from prison medical staff, Mr. Winter's medical and disciplinary records, and declarations from investigating officers with attached photographs.

As discussed later in this order and judgment, we reject Mr. Winter's contention on appeal that the district court erred when it adopted the Defendants' statement of material facts because Mr. Winter did not controvert them.  The following recitation is thus based on the evidentiary record presented to the district court and the Defendants' statement of material facts.

---

[1] Portions of the record, including the videos, were sealed in the district court and remain sealed on appeal.  Appellees have provided detailed descriptions of the events based on the videos in their publicly filed briefs.  The videos will remain under seal, but appellees have waived any interest in sealing the district court's or their written descriptions of the videos.

1. **Stabbings**

The record shows that on October 26, 2018, while an inmate at EDCF, Mr. Winter said his "paranoia got the best of him, so he stabbed his [cellmate] in the chest and arms." ROA, Vol. 1 at 19. He "had his [cellmate's] blood on his hands and he was freaking out," so he told prison staff that he had injured himself and he needed to go to the prison's medical clinic. *Id.* at 20. But according to Mr. Winter, he "had mentally checked out and immediately got into a physical altercation with staff and . . . stabbed" two officers. *Id.* Video of the altercation shows Mr. Winter repeatedly stab both officers. During the stabbings, Mr. Winter's cellmate punched, kicked, and kneed one of the officers who was stabbed and then, after jumping around, threw a cart at the second officer. After officers pepper-sprayed both inmates, Mr. Winter surrendered and was handcuffed.

2. **Escort to Clinic**

Two Special Security Team ("SST") members—Corporal Gladfelter and another officer—escorted Mr. Winter to the clinic for evaluation and a "shower to be decontaminated from the pepper spray." ROA, Vol. 1 at 21; *see also id.* at 299, para. 4 (Gladfelter Decl.) (indicating he assisted with escorting Mr. Winter "to the infirmary for medical assessment and decontamination"). Corporal Gladfelter said Mr. Winter was "acting erratically," "speaking of space aliens[,] and screaming that the escort team was trying to cut off his genitals." *Id.* at 299, para. 4 (Gladfelter Decl.). The officers brought Mr. Winter to the clinic using a modified escort position—they lifted his arms upward while they were handcuffed behind his back

4

and simultaneously pushed down on the back of his head, causing him to walk in a bent-over position. *See id.*, para. 5 (Gladfelter Decl.).

3. **Clinic**

At the clinic, Mr. Winter reported he was under the influence of methamphetamine. *Id.* at 73. He later claimed that he lied and "did not get high until later," *id.*, when he swallowed drugs concealed in his cheek, *id.* at 75. Officers and medical staff thought Mr. Winter was under the influence of some kind of substance. *See, e.g.*, *id.* at 155, para. 7 (Baynham Aff.); *id.* at 269 (clinic note); *id.* at 299, para. 4 (Gladfelter Decl.). In the clinic, he eventually calmed down and was compliant enough to allow medical staff to assess him. Afterwards, he was escorted to a shower in a regular, upright position. *Id.* at 300, para. 6 (Gladfelter Decl.).

As Mr. Winter left the shower, Corporal Gladfelter and the other escorting officer put Mr. Winter back into the modified escort position to move him through the clinic and a pill-line area. Without warning, the other officer, who is not a party in this case, initiated a take-down, *id.* at 301, para. 11 (Gladfelter Decl.), causing Mr. Winter to hit his head on the floor and sustain a large laceration above his left eyebrow, which bled profusely, *id.* at 304, para. 4 (Corby Decl.). Medical staff tried to treat the wound, but Mr. Winter refused to cooperate. Officers covered his head with a spit mask, placed him in a restraint chair, and transported him into the clinic for treatment. *Id.* at 304-05, para. 5-7 (Corby Decl.).

Back in the clinic, Mr. Winter thrashed about and prevented medical staff from stitching his wound. *See id.* A nurse documented the situation in a detailed clinic

5

note indicating that when she was first asked to assess Mr. Winter, "[h]e was lying on the floor with blood on his face and [a] pool of blood on the floor." *Id.* at 268. She described how he spit at her and repeatedly resisted her efforts to treat him:

> As patient spat at the provider twice, officers placed a spit hood on him. He had been cleaned up as much as possible at that time and restrained to a chair. He was taken to Exam room 1 so he could be assessed and [the] laceration sutured.
>
> Spit hood was cut at patient's forehead and brought down enough that laceration could be cleaned. Betadine and alcohol x3 used to clean area. Lidocaine 1% 2.5 ml used to numb area. Patent was given a Tdap with his verbal consent . . . . Patient tolerated lidocaine injection well. I attempted to suture laceration, and the needle was placed through both sides and then patient started jerking his head around and yelling. SST [officer] restrained patient and told him to stop resisting. I attempted again to suture the laceration, and patient jerked his head again and started yelling. At that time, I determined it was not safe to attempt to suture his laceration. Dermabond was applied, and I attempted to approximate laceration, however[,] patient continued to move and SST restrained him again. . . . He was uncooperative with assessment [and] would not cooperate with EOM exam. . . .
>
> Due to patient's head injury, and inability of this provider to obtain a proper neuro check [due to] patient being uncooperative, he is not medically cleared to be transferred to [another prison]. . . . Patient's change in behavior may be due to being under the influence, or due to the head injury.

*Id.* at 268-69.

### 4. B Cell Block

At that point, a five-person egress team assembled to move Mr. Winter to a restrictive housing unit in the B cell block. The five SST officers included Corporals

Gladfelter, Corby, and Dunn, who moved Mr. Winter in the restraint chair. *See* ROA, Vol. 1 at 301, para. 13 (Gladfelter Decl.); *id.* at 305, para. 8 (Corby Decl.); *id.* at 310, para. 4 (Dunn Decl.). Corporal Chiles assisted, *see id.* at 307, para. 4-5 (Chiles Decl.), and Sergeant Leon escorted, *id.* at 315 (Leon incident report).

When the officers arrived at the B cell block, the egress team attempted to release Mr. Winter from the restraint chair into cell 131. A brawl ensued. Mr. Winter "thrust[] his abdomen forward in an attempt to loosen the restraints on the restraint chair." *Id.* at 308, para. 6 (Chiles Decl.). The shackles on his legs did not prevent him from kicking. *Id.*, Vol. 3 at 47, para. 6 (Cannon Decl.). Mr. Winter attempted to kick, bite, and grab the officers. *See id.*, Vol. 1 at 311, para. 5 (Dunn Decl.); *id.* at 302, para. 18 (Gladfelter Decl.). He spit blood at them. *Id.* at 315 (Leon incident report). He ignored commands to stop resisting, prompting the officers to use restraint and joint manipulation techniques to no avail. *See id.*; *see also id.* at 301, para. 16 (Gladfelter Decl.). Because Mr. Winter reopened the laceration on his head, medical staff again attempted to treat his head injury, but they were unable to do so due to his belligerence. *Id.* at 302, para. 21-22 (Gladfelter Decl.); *id.* at 316 (Leon incident report).

Given Mr. Winter's continued resistance, the officers attempted to return him to the restraint chair. *See id.* at 315-16 (Leon incident report). He then "became more combative toward [the officers] and attempt[ed] to bite [Corporal] Corby." *Id.* During the struggle, two officers used open palm strikes to Mr. Winter's legs to gain his compliance and stop him from kicking the officers. *Id.* at 301, para. 17

(Gladfelter Decl.); *id.* at 305, para. 10 (Corby Decl.).  After Mr. Winter kicked two officers, Corporal Gladfelter delivered two knee strikes to his leg.  *Id.* at 302, para. 23 (Gladfelter Decl.).  Because Mr. Winter continued to ignore orders to stop resisting and persisted in attempting to bite, kick, and spit blood at the officers, Corporal Dunn delivered closed-fist strikes to the large muscle mass areas of his leg and back.  *See id.* at 311, para. 6-7 (Dunn Decl.).  Eventually, the officers secured Mr. Winter back into the restraint chair.  *See, e.g.*, *id.* at 302, para. 24 (Gladfelter Decl.).  They used no further force.  *See id.* at 311, para. 8 (Dunn Decl.).

Corporal Gladfelter said that "[d]uring the entire incident in [the] B cell [block], . . . Mr. Winter acted extremely aggressive, erratic, and delusional."  *Id.* at 303.  Corporal Corby said he slipped on blood and fractured his hand.  *Id.* at 306, para. 13.  Corporal Chiles said Mr. Winter kicked him in the chest and kneed him in the eye.  *See id.* at 308, para. 10-11 (Chiles Decl.).  For his part, Mr. Winter was transferred while handcuffed in the restraint chair to a different prison, the Hutchinson Correctional Facility ("HCF").  He was later treated at a hospital.  *See id.* at 157, para. 12 (Baynham Aff.).

## B.  *Procedural History*

In his complaint, Mr. Winter alleged Eighth Amendment and unspecified state-law tort violations by the named and unnamed Defendants in their official and individual capacities.  Specifically, he claimed Corizon was deliberately indifferent to his serious medical needs in failing to provide him with adequate treatment.  He also claimed Corporals Chiles, Corby, Dunn, and Gladfelter were liable for using

8

excessive force.  He alleged that Corporals Gladfelter and Corby placed him in the modified escort position, intentionally slammed his face into the concrete floor, and, with Corporals Chiles and Dunn, beat him in cell 131.  After prison officials investigated, the *Martinez* report attributed the take-down to another officer who is not a named party to this suit.  Mr. Winter acknowledged as much, *see* Suppl. ROA, Vol. 5 at 18, para. 5 (Summ. J. Resp.), but he did not seek leave to amend his complaint.

The complaint also alleged that before Mr. Winter was transferred to another facility, Corporals Chiles and Dunn cut his wrists and then Corporal Dunn clamped down his handcuffs as tight as possible into the wounds.  Finally, Mr. Winter alleged that Captain Mansfield and Sergeant Leon failed to intervene at various times during these events.

In their summary judgment motion, the Defendants provided a statement of material facts.  The district court deemed these facts admitted for two reasons.  *See* ROA, Vol. 3 at 201.  First, it found that Mr. Winter's summary judgment filings failed to respond to Defendants' facts or failed to controvert them with specific record citations.  *See id.* at 202.  Second, the court determined that Mr. Winter provided no evidentiary support for his allegations, which it found to be conclusory, self-serving, contradictory, and demonstrably false.  *See id.* at 203-04.

The district court (1) dismissed Corizon and Mr. Winter's official-capacity claims, (2) granted summary judgment based on qualified immunity on the individual-capacity Eighth Amendment excessive-force and failure-to-intervene

9

claims, and (3) declined to exercise supplemental jurisdiction over the state-law claims.

## II. **DISCUSSION**

On appeal, Mr. Winter argues that the district erred in (A) determining the facts, (B) granting summary judgment, and (C) refusing to exercise supplemental jurisdiction over his state-law claims.

### A. *District Court's Factual Determinations*

We first address Mr. Winter's arguments that the district court incorrectly determined the facts.

### 1. **Mr. Winter Failed to Controvert Defendants' Facts with Specific Citations to Record Evidence**

Mr. Winters concedes that "[i]n some regards [it] is true" that he failed to provide specific record citations to controvert Defendants' facts. Aplt. Br. at 12. But he contends that he pointed to some record facts in his filings opposing summary judgment. For example, he refers us to page 8 of his summary judgment response, *see* Suppl. ROA, Vol. 5 at 23 (Summ. J. Resp.), where he cited his own affidavit and eight paragraphs of the *Martinez* report to allege that the use of force was unnecessary because he was restrained. His response, however, provided no specific citation to his lengthy affidavit, nor did it identify which of Defendants' facts he sought to controvert. *See Janny v. Gamez*, 8 F.4th 883, 899 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 878 (2022) ("[T]he party opposing summary judgment must designate *specific* facts showing that there is a genuine issue for trial." (quotations

omitted)).  Also, it is undisputed that he was restrained due to the stabbings.

Mr. Winter also contends his opposition to Defendants' statement of facts identified numerous factual disputes with record citations.  But again, his opposition either provided no citations or it simply referred to his affidavit and the *Martinez* report without specific citations, *see, e.g.,* Suppl. ROA, Vol. 5 at 150-53, which is inadequate under Federal Rule of Civil Procedure 56:

> Under Rule 56, a party asserting that a fact is genuinely disputed must support the assertion by citing to particular parts of materials in the record.  Where a report or other material is made part of the record but the party fails to cite to the particular parts of the record that support a particular argument, the district court is under no obligation to parse through the record to find the uncited materials.

*Doe v. Univ. of Denver*, 952 F.3d 1182, 1191 (10th Cir. 2020) (quotations, brackets, ellipsis, and citation omitted); *see Janny*, 8 F.4th at 899 ("[T]o oppose summary judgment, the nonmovant must ensure that the factual dispute is portrayed with particularity." (quotation omitted)).  Mr. Winter's failure to provide specific record citations left Defendants' statement of facts uncontroverted.

## 2.  **Mr. Winter Failed to Substantiate His Allegations with Record Evidence**

The district court also declined to credit Mr. Winter's allegations in both his complaint and affidavit because, in the court's view, they were conclusory, contradictory, self-serving, and demonstrably false.  A "verified complaint . . . may be treated as an affidavit on summary judgment." *Janny*, 8 F.4th at 899.  But "[a]ffidavits must contain certain indicia of reliability.  Unsubstantiated allegations

11

carry no probative weight in summary judgment proceedings; they must be based on more than mere speculation, conjecture, or surmise." *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (quotations and brackets omitted). "We do not consider conclusory and self-serving affidavits." *Id.* (quotations omitted). Our review of the record confirms that the district court properly declined to credit Mr. Winter's unsubstantiated allegations.

    a. *Mr. Winter's version of events*

In his complaint and affidavit, Mr. Winter admits he stabbed three people while in a paranoid mental state. *See* ROA, Vol. 1 at 19-20 (Compl.); *id.* at 37-38 (Winter Aff.). But he claimed the entire incident was a preplanned use of force by Defendants. *See* Suppl. ROA, Vol. 5 at 20, para. 10 (Summ. J. Resp.). He said he immediately surrendered, and while his arms were handcuffed behind his back, Corporal Gladfelter and another officer wrenched his arms over his head enroute to the clinic. *See* ROA, Vol. 1 at 20 (Compl.); *id.* at 38 (Winter Aff.). He alleged that Corporal Gladfelter pepper-sprayed him during the shower,[2] and that afterwards Corporal Gladfelter and the other officer again raised his arms above his head and intentionally slammed his face into the concrete floor, knocking him unconscious. *See id.* at 21 (Compl.); *id.* at 38-39 (Winter Aff.).

---

    [2] It is undisputed that officers pepper-sprayed Mr. Winter immediately after the stabbings, but Mr. Winter also alleged, and the Defendants denied, that Corporal Gladfelter pepper-sprayed him a second time while he was in the shower.

Mr. Winter further alleged that when he came to, Corporal Gladfelter maliciously broke his pinky finger and officers slammed him into the restraint chair. *See id.* at 21-22 (Compl.); *id.* at 39 (Winter Aff.). He asserted that he then realized his left eye had popped out of its socket and was dangling against his face. *Id.* at 22 (Compl.); *id.* at 40 (Winter Aff.). He denied spitting on anyone and said Defendants covered his head with the spit mask to conceal his injuries. *See id.* at 22 (Compl.); *id.* at 40 (Winter Aff.). He also alleged he was wheeled to a room where someone (he now identifies as Corporal Corby) began choking him from behind while Captain Mansfield and Sergeant Leon did nothing to intervene. *See id.* at 22 (Compl.); *id.* at 40 (Winter Aff.).

Additionally, Mr. Winter alleged that when he was taken to the B cell block, a doctor or a nurse pushed his dangling eye back into its socket. *See id.* at 23 (Compl.); *id.* at 40 (Winter Aff.). Officers then wheeled him into a cell and dumped him face-first onto the floor while he was still strapped in the restraint chair. *See id.* at 23 (Compl.); *id.* at 41-42. He asserted the officers continued to beat him, causing him to bite through his tongue and break several teeth. *See id.* at 23-24 (Compl.); *id.* at 42 (Winter Aff.). And as he waited to be transferred to HCF, he said he overheard Corporals Corby and Dunn discussing how to slit his wrists to make it look like suicide. *See id.* at 24 (Compl.); *id.* at 43 (Winter Aff.). He alleged they actually did cut his wrists and then Corporal Dunn clamped down the handcuffs into his wounds. *See id.* at 24-25 (Compl.); *id.* at 43-44.

b. *Variance between the record and Mr. Winter's version*

Mr. Winter's version of events is "so utterly discredited by the record that no reasonable jury could have believed him." *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (quotations omitted).

- He asserted without any supporting evidence that the officers preplanned the incident, but he does not dispute that he was paranoid and stabbed his cellmate and two guards. The video shows Mr. Winter's cellmate punching, kneeing and kicking one of the guards.

- He cites the aforementioned note written by a clinic nurse, but the note supports Defendants' statement of the facts. It indicates she attempted to stitch Mr. Winter's head wound, but he "started jerking his head around and yelling[, so an] SST [officer] restrained [him] and told him to stop resisting." ROA, Vol. 1 at 268. The nurse decided it was unsafe to continue trying to suture the wound. She wrote that officers put the spit mask on Mr. Winter because he spat at her twice. She also repeatedly indicated that he was uncooperative and resistant. As a result, she could not medically clear him for transfer.

- Mr. Winter alleged that Corporal Gladfelter pepper-sprayed him in the shower, but he cited no evidence to support that assertion, and the video shows the officers leaning against a wall for the short time he was in the shower.

- He insisted that someone popped his eyeball out of its socket and punched him in the head. These allegations are unsubstantiated. Consistent with the laceration on his left eyebrow, treatment notes show he had bruising and swelling around his eye and burst blood vessels in his eye, but nothing to suggest his eye popped from its socket. The videos do not depict his eyeball out of its socket or that someone punched his head. Hospital notes indicate that he "report[ed] he got high on meth and [didn't] know what happened[.]" *Id.* His exam revealed bruising and swelling to his left orbital area and a 3 cm laceration to the eyebrow/forehead. Although he thought he may have lost consciousness, he reported no other complaints. *See id.* The wound was cleaned and repaired, and there was no muscle, tendon, nerve injury or foreign body found. *Id.* at 287. And a CT scan indicated a "[m]inimally displaced left nasal bone fracture of an indeterminate age." *Id.* at 296.

14

- Similarly, although Mr. Winter insists Corporal Gladfelter broke his finger, x-rays showed only an old, healed fracture in his left hand and no fractures in his right hand.

- Mr. Winter alleged that Corporal Corby choked him until he nearly lost consciousness.  But the video shows that when he was placed in the restraint chair, an officer—apparently Corporal Corby—restrained his head by holding his chin so other staff members could secure the restraint straps and suture his wound.  Medical staff declined to attempt to suture the wound, and at no point did the officer grasp Mr. Winter's neck.  After he was wheeled back into the clinic, the video does not depict the exam, but the clinic nurse documented it in detail, including the SST officer's attempt to restrain Mr. Winter when he "started jerking his head around and yelling" while she was attempting to suture his wound.  *Id.* at 268.

- Mr. Winter cites no evidence that he bit through his tongue.  Treatment notes show it was bruised on the side, and a dentist saw him the day after the altercation and observed no broken teeth or laceration to his tongue.  For security reasons, the dentist could view only Mr. Winter's mouth through a window, but another dentist examined him two and a half months later and found only one fractured tooth.  Although the second dentist could not rule out the possibility that the tooth was fractured in the altercation, he said Mr. Winter would have experienced immediate pain, but he did not request to be seen for more than ten weeks.

- No competent evidence suggests Defendants attempted to cut off his testicles or slit his wrists, as he alleged.  Mr. Winter relied on the declaration of an inmate whose cell shared an air vent with cell 131 in the B cell block.  That inmate said that he heard a man screaming through the air vent that officers were attempting to kill him and cut off his testicles.  Based on the sounds, he stated he believed the officers were trying to kill the man.  But "at the summary judgment stage, statements of mere belief in an affidavit must be disregarded." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quotations omitted).  Although the inmate may have heard screaming and sounds of a struggle, this would indicate only that Mr. Winter was screaming during the struggle.

- The same is true of another inmate's declaration that Mr. Winter relied upon.  Mr. Winter alleged this inmate witnessed the officers dump him from the restraint chair, but the inmate said no such thing.  Instead, this

inmate said he too was confined in the B cell block, and although he could not see into the cell because one of the officers stood in the doorway, he could hear the beating and Mr. Winter saying that he was not resisting. But this inmate acknowledged that he could not see into the cell and that he also heard an officer repeatedly tell Mr. Winter to stop resisting. Again, although this inmate may have heard sounds of a struggle, this indicates only that Mr. Winter was engaged in a struggle.

- Mr. Winter claims someone slit his wrists, citing an investigation report stating that he had lacerations on his wrists. But the same report, completed two weeks after the incident, stated that his wounds were contemporaneously photographed, and the photos show only a small scab on the outside of his right wrist and minor bruising on inside of his left wrist. The officer who authored the report said that his use of the word "lacerations" referred to scabs. Additionally, a clinic note from just after the altercation said that Mr. Winter was "under the influence of a substance" and "believed he was being cut with razors and was not oriented to the situation." ROA, Vol. 1 at 271. It further stated that he "was rambling and denied suicidal thoughts and intent." *Id.* Although Mr. Winter refers us to medical records indicating he sought treatment for wrist pain, this does not create a material factual issue as to whether someone slit his wrists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (explaining that there must be sufficient evidence for a reasonable jury to return a verdict in favor of the nonmoving party, and if the evidence is merely colorable or not significantly probative, summary judgment may be granted).

\* \* \* \*

Mr. Winter fails to show the district court erred in refusing to credit his version of events.

## B. *Summary Judgment*

### 1. **Legal Background**

#### a. *Standard of review*

"We review *de novo* a district court's decision to grant a motion for summary judgment." *Lindsey v. Hyler*, 918 F.3d 1109, 1113 (10th Cir. 2019). "The court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Rowell v. Bd. of Cnty. Comm'rs*, 978 F.3d 1165, 1171 (10th Cir. 2020) (quotations omitted). Although a party may rely on an affidavit "to establish a fact for summary judgment purposes, [it] must set forth facts, not conclusory statements." *Janny*, 8 F.4th at 899 (quotations omitted). "[W]e view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party," but "we cannot ignore clear, contrary video evidence in the record depicting the events as they occurred." *Rowell*, 978 F.3d at 1171 (quotations omitted).

b. *Qualified immunity*

"A defendant's motion for summary judgment based on qualified immunity imposes on the plaintiff the burden of showing both (1) a violation of a constitutional right; and (2) that the constitutional right was clearly established at the time of the violation." *Id.* (quotations omitted). "We exercise our sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* (quotations omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quotations omitted). In reviewing for clearly established law, we evaluate "whether the violative nature of *particular*

conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Id.* at 12 (quotations omitted).

      c. *Eighth Amendment—excessive force*

"An excessive force claim involves two prongs:  (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Redmond*, 882 F.3d at 936 (quotations and brackets omitted).  Our analysis focuses on the subjective prong.  A prison "official has a culpable state of mind if he uses force maliciously and sadistically for the very purpose of causing harm, rather than in a good faith effort to maintain or restore discipline." *Id.* (quotations omitted).  Prison officials must balance the need to restore order and discipline against the risk of injury to inmates if force is used, and they must often "make their decisions in haste, under pressure, and frequently without the luxury of a second chance." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quotations omitted).  Factors relevant to evaluating the subjective prong include the extent of the inmate's injury, "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* at 7 (quotations omitted).

2. **Application**

      In evaluating the officers' use of force, the district court analyzed (a) the modified escort position, (b) the take-down, (c) the use of force during the second

clinic evaluation, (d) the use of force in the B cell block, (e) the use of handcuffs, and (f) Captain Mansfield and Sergeant Leon's liability for failing to intervene. In each instance, the court said that no reasonable jury could find that any officer acted maliciously to cause harm under the second prong of an excessive force claim. Affording Mr. Winter's pro se brief a liberal construction, *see Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007), we agree with the district court and affirm.

   a. *Modified escort position*

   This part of Mr. Winter's claim concerns Corporal Gladfelter and the non-party officer. In his appellate brief, Mr. Winter hardly discusses use of the modified escort position. His arguments are otherwise unavailing. He says he experienced "immense pain" in the modified escort position, Aplt. Br. at 3, but the record shows he suffered no injury. The officers needed to apply force—he had just stabbed three people during a "paranoid episode," *id.* at 2, and Mr. Winter's cellmate had kicked, kneed, and punched one of the officers. Corporal Gladfelter described Mr. Winter as delusional, erratic, and uncooperative enroute to the clinic. Mr. Winter posed a grave threat to the safety of staff and inmates.

   The modified escort position was a proportional response. Corporal Gladfelter and the non-party did not employ the modified escort position from the clinic to the shower. But after Mr. Winter spit at Corporal Gladfelter during the shower and directly approached Corporal Gladfelter as he left the shower (as shown on the video), the officers reemployed the restraint position. Under these circumstances, Mr. Winter did not show a constitutional violation under the subjective prong of an

excessive force claim.  He also fails to cite clearly established law.  The district court thus did not err in granting qualified immunity.

b. *Take-down*

The take-down claim also concerns Corporal Gladfelter and the non-party officer.  Mr. Winter again hardly briefs this issue, and the officer who initiated the take-down is not a party to this case.  Corporal Gladfelter had no warning and no way to stop it.  Mr. Winter cannot show Corporal Gladfelter acted with malicious intent for purposes of the subjective prong, and he therefore fails to establish a constitutional violation.  He also makes no effort to cite clearly established law.  The district court did not err in granting qualified immunity on this claim.

c. *Second clinic evaluation*

Mr. Winter contends Defendants used excessive force during the second clinic evaluation when Corporal Corby allegedly "choked him to the point of near unconsciousness." *Id.* at 20.  The video in the pill-line area blatantly contradicts his allegation.  Moreover, Mr. Winter sustained no injury when Corporal Corby restrained his head, which he plainly needed to do because Mr. Winter had sustained a head laceration that was bleeding profusely, he was actively resisting, and staff could not suture the wound.

Corporal Corby's actions were reasonable and proportional.  He briefly held Mr. Winter's head under his chin for less than a minute, just long enough to allow other officers to secure the straps on the restraint chair.  Mr. Winter posed a continuing threat to his own safety and that of the staff around him.  He was

bleeding, refused to cooperate, and twice spit at a nurse. Corporal Corby let go once Mr. Winter was secured in the chair.

After Mr. Winter was wheeled into the exam room, the nurse documented her efforts to treat him and his continuing efforts to actively resist. She said that an SST officer, presumably Corporal Corby, restrained him and told him to stop resisting because she had "placed the needle . . . through both sides [of the laceration]," but he "started jerking his head around and yelling." ROA, Vol. 1 at 268. She also said that he "was uncooperative with the assessment" and that his "change in behavior [might] have been due to being under the influence, or due to the head injury." *Id.* at 269.

Under the circumstances, Mr. Winter posed a danger to himself and to staff. The evidence shows the officers acted in good faith to maintain or restore discipline. He thus fails to establish a constitutional violation, and he again identifies no clearly established law. We therefore find no error in the district court's grant of qualified immunity on this claim.

d. *Use of force in the B cell block*

Mr. Winter challenged Defendants' use of force in the B cell block when they attempted to confine him in cell 131. This claim implicates Corporals Gladfelter, Corby, Dunn, and Chiles, as well as Sergeant Leon. Mr. Winter sustained no serious injuries. Shortly after the officers attempted to release Mr. Winter from the restraint chair, they justifiably applied force because he immediately began thrashing about and tried to kick and bite the officers. They attempted to lift him out of the chair and onto the floor, but his resistance caused them to lose control of the situation. The

officers attempted to resecure Mr. Winter into the restraint chair while he continued to resist.

Corporal Gladfelter used a joint manipulation technique on Mr. Winter's ankle, but that proved ineffective, so he delivered two open-palm strikes to Mr. Winter's thigh to stop him from kicking the officers. He also delivered two open-palm strikes to Mr. Winter's upper back to stop him from biting Corporal Corby and two knee strikes to Mr. Winter's leg after he kicked two officers. The other officers used similar force while Mr. Winter continued thrashing about, spitting blood at them, kicking them, and attempting to bite them. Corporal Chiles described Mr. Winter as "extremely violent, erratic, and under the influence." *Id.* at 309, para. 13 (Chiles Decl.). Corporal Corby fractured his hand when he slipped and fell on blood from Mr. Winter's head wound. The altercation continued until the officers finally secured Mr. Winter back into the restraint chair. No further force was used.

Given these circumstances, a reasonable jury could not say Defendants' actions were disproportionate to the need for force. Mr. Winter was noncompliant and combative. He caused the officers to lose control of the situation when they attempted to release him from the chair into the cell. Their use of force was commensurate to regain control. We do not question their "instantaneous, on-the-spot decisions." *Sampley v. Ruettgers*, 704 F.2d 491, 496 (10th Cir. 1983).

Neither can we ignore the obvious security threat Mr. Winter posed. He had already stabbed three people, and he admitted he was in a compromised mental state and under the influence of some kind of drug. He also had spat on a nurse and

22

repeatedly resisted all efforts to treat and transfer him.  Thus, when the officers attempted to release him into cell 131, they reasonably perceived his violence as a significant threat.  The district court did not err in concluding that Mr. Winter failed to show a constitutional violation.

Mr. Winter also fails to show any violation of clearly-established law.  *See Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001) (recognizing court must grant qualified immunity if plaintiff fails to satisfy either prong of the qualified immunity test).  He cites *Lewis v. Downs*, 774 F.2d 711, 712-13 (6th Cir. 1985) (per curiam), *abrogated by Graham v. Connor*, 490 U.S. 386 (1989), and *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002).  Neither case is binding Supreme Court or Tenth Circuit precedent, and they do not demonstrate the clear weight of authority from other circuits.  *See Ashaheed v. Currington*, 7 F.4th 1236, 1246 (10th Cir. 2021) ("A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." (quotations omitted)).

Further, *Lewis* is distinguishable.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (recognizing that "existing precedent must have placed the . . . constitutional question beyond debate"); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (explaining that "the clearly established analysis" entails "identify[ing] a case where an officer act[ed] under similar circumstances" (quotations omitted)).  *Lewis* involved two officers called to an argument between a family and neighbors.  774 F.2d at 712.  A mother was hysterical but partially compliant, though her son attempted to prevent her arrest while her husband attempted to prevent the son's

23

arrest. *See id.* at 712-13. One officer severely twisted the mother's arm and kicked her in the back and buttocks as she lay handcuffed on the ground. *See id.* at 712. He also pulled her son's hair, twisted his arm, put him in a choke hold, and struck him in the mouth with a nightstick. *See id.* at 713. The other officer struck the father on the head with his nightstick, causing profuse bleeding. *See id.* These facts do not resemble ours.

*Skrtich* also is distinguishable—officers severely beat an inmate who did not physically resist after he was shocked with an electronic shield. *See* 280 F.3d at 1299-1300. By contrast, Mr. Winter initiated violence and resisted throughout the ordeal in cell 131. The district court did not err in granting qualified immunity.

e. *Handcuffs*

Mr. Winter also contends that Corporal Dunn restrained him in handcuffs that were too tight. Clinic notes from shortly after the stabbing indicate that Mr. Winter complained of only "slight pain" from the handcuffs, without any numbness, tingling or weakness, and he retained full range of motion. ROA, Vol. 1 at 240. The photos taken of his hands two weeks after the incident show only a small scab on the outside of his right wrist and minor bruising on inside of his left wrist. Although Mr. Winter now asserts he suffers permanent nerve damage from the handcuffing, he reported during a March 2021 clinic appointment that a neurologist had told him several years earlier he had carpal tunnel syndrome. *Id.*, Vol. 3 at 162.

This evidence indicates only minor injuries from the handcuffs. Also, the officers had a plain need to handcuff Mr. Winter to thwart the significant security

24

threat he posed. Mr. Winter's violent and combative behavior required the handcuffs to restrain him. On balance, use of handcuffs was proportionate to the need to restore order and discipline, and Mr. Winter fails to show a constitutional violation.

Mr. Winter cites three out-of-circuit cases to show clearly established law. They are factually distinguishable. First, *Lyons v. City of Xenia* involved a mother who struggled with an officer trying to question her daughter. *See* 417 F.3d 565, 570 (6th Cir. 2005). A second officer tackled the mother and handcuffed her "as tight as he could." *See id.* at 570, 576 (quotations omitted). The tightness lasted only through the moment she was handcuffed, she sustained only bruising, and she did not complain that the handcuffs were too tight. *Id.* at 575-76 (quotations omitted). Second, *Wall v. County of Orange*, 364 F.3d 1107 (9th Cir. 2004), involved a disgruntled but compliant dentist who was attacked by an officer from behind and whose injuries from "extremely tight" handcuffs forced him to give up his profession. *Id.* at 1109-10 (quotations omitted). Finally, *Kopec v. Tate*, 361 F.3d 772, 774 (3d Cir. 2004), involved a couple who had trespassed and "proceeded to frolic" on a frozen lake. Because these cases are so factually distinct from this case, they would not have put a reasonable officer in Corporal Dunn's position on notice that he was violating Mr. Winter's Eighth Amendment rights. *See Mullenix*, 577 U.S. at 11. The district court did not err in granting qualified immunity.

f.  *Failure to intervene*

Mr. Winter contends the district court erred in granting qualified immunity on his claim that Captain Mansfield and Sergeant Leon failed to intervene. "[A] law

enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable. . . ." *Est. of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014) (quotations omitted). But "for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (quotations omitted). Because there was no underlying constitutional violation, the district court correctly rejected Mr. Winter's failure-to-intervene claim.[3]

Mr. Winter cites *Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996), as clearly established law, but it did not involve similar circumstances. Officers confronted a woman and her daughters parked in her car, waiting for a motorcade to pass. *Id.* at 1130. An officer failed to intervene as another officer allegedly pulled the woman from her car by her arm and neck, threw her to the ground, put his foot on her back, dragged her across the ground, and then spun her into the air by her handcuffed wrist. *See id.* at 1130-31. Mr. Winter again fails to show the district court erred in granting Defendants qualified immunity.

## C. *State-Law Claims*

Finally, Mr. Winter contests the district court's refusal to exercise supplemental jurisdiction over his unspecified state-law tort claims. The district court did not abuse its discretion. *See Koch v. City of Del City*, 660 F.3d 1228, 1248

---

[3] There is also evidence that Captain Mansfield was not present for any of the events in question. *See* ROA, Vol. 1 at 151-52.

(10th Cir. 2011) (stating the standard of review). "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Id.* (quotations omitted). Having disposed of all federal claims, the district court appropriately declined to exercise supplemental jurisdiction over Mr. Winter's state-law claims.

## III. **CONCLUSION**

We affirm the district court's judgment.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge